case number 25-5037 et al. Kathy A. Harris in her personal capacity and in her official capacity as a member of the Merit Systems Protection Board v. Scott DeSantis in his official capacity as Secretary of the Treasury et al. et al. and case number 25-5067 Gwynne A. Wilcox v. Donald J. Trump in his official capacity as President of the United States and Marvin A. Kaplan in his official capacity as Chairman of the National Labor Relations Board et al. Mr. Graeber for the et al. Mr. Zielinski for Appellee Kathy Harris. Mr. Gupta for Appellee Gwynne Wilcox. Mr. Graeber, come on up. Good morning. Good morning. Judge Casas, may it please the Court, Harry Graeber for the United States. This case is controlled by Supreme Court precedent, and under that precedent, the government wins for two independent reasons. First, as to the merits, the Supreme Court has made clear that if an executive agency wields substantial executive power, then the heads of that agency must be removable at will. As Justice Kavanaugh recognized, and as Judge Walker has explained, that describes the NLRB and the MSPB to a T. Second, as to remedy, the Supreme Court has been equally clear that the federal courts cannot issue an injunction that forces the reinstatement of a federal officer. Because the injunctions below do just that, they are improper. Now, for their part, my friends offer two main counterarguments for why their claims are not foreclosed by binding Supreme Court precedent, but I don't think either works. On the merits, their main point is that the NLRB and the MSPB are primarily adjudicatory bodies, primarily adjudicatory bodies. That is true, but it is a woefully incomplete answer. Article two does not just care about how an agency wields executive power. It cares, indeed, it cares most about how much power an agency wields. Isn't your position that any agency that is housed within the executive branch wields substantial executive power and therefore must be subject to at will removal? Yeah, I think that the Sealy law test is for traditional... Yes or no question. Which is the first clause of that? No, the question was, is it your position that all agencies housed within the executive branch wield substantial executive power such that they must be subject to at will removal? Yes. So is there any agency, currently an independent agency, that would be allowed to be subject to foreclosure removal? Any agency? I'm not sure. I mean, I think that I want to answer the question directly. One brief preface is that I do think that the court's injunction in free enterprise and Sealy law to take each case as it comes is an important one. You look at the agency that's before you, each presents its own questions, each might have its own history. But off the top of your head, you can't think of any independent agency that currently could be subject to foreclosure? So yeah, without taking a definitive position, I don't think it's a null set. My colleague, last time he was up here, said something like ACUS, an advisory body like ACUS could count. I think there's something to recommend for that. The real test is whether you meet the yardstick of the 1935 FTC. Another example like that, something that really looks like a judicial legislative aid. So if I could ask you, it seems then that your position is that virtually any independent agency that currently exists has to be reconfigured. We can't have forecaused removal restrictions for that. And so I just want you to put aside the case law and the historical evidence for a moment and think about this. Your position is we're not allowed to have independent agencies in this country, even if they can be beneficial, like the Federal Reserve. They're good reasons to have them. But our government is constitutionally not allowed to have independent agencies. Can you explain why that's a good way to run a government? Why would the framers have wanted to put this constraint on our government? So two points, Judge Pan. First, our position is simply the position from Celia Law. I understand. I'm asking you just to put aside all that for a moment. Okay. I don't know if it necessarily cuts. Why is this a good way to run a government? Why would the framers have intended for this to be the way we must run our government as a constitutional matter? Because the way in which the executive branch should work turns on accountability. That is the essence of Article II. It is a unitary, energetic executive that answers to the people. And the only way, the only way in which the executive branch can be answerable to the people is if the president is answerable to the people. The only way that works is if the executive agencies that wield his power answer to him. And I believe your position is that it's a harm, like it's going to harm liberty if we don't, I guess, look at the separation of powers this way. Is that your position? Yeah. I think that if the court departs from Article II's design, that inflicts a constitutional harm on the country. Okay. So we've had independent agencies for over 90 years now, at least over 90 years. There's about 30 of them or more currently outstanding. Can you just give me an example of how our country has been harmed by the existence of these independent agencies? I think that the harm is the blurring of the lines of accountability that takes place. That is the fundamental problem. I mean, a good example might be, you know, it's going out- But that's a harm in and of itself. That's like a paper harm you're talking about. So here's at least one- I'm asking, is there an actual tangible harm to our country from having independent agencies? Here's at least maybe one example that comes to mind. There's a whole kerfuffle in the last administration about whether or not we're going to ban gas stoves. And the CPSC, an independent agency, was contemplating banning gas stoves. Huge political blowback to it. But the president was able to turn around and say, hey, not my problem. That's a policy judgment made by an independent agency. That blurring of the line of accountability is incompatible with our political system. That's exactly the logic of Celia Law, of Collins, of Arthrex, where we need a system of accountability in place for the presidency to work. And again, this is- to the voters, was he? Because at that point, the president was selected by the Electoral College and the Constitution said that all the states can decide who can be the electors of the Electoral College. And many states just had the state legislators choose the electors. So that's not accountability to the people, is it? It's people all the way down. I mean, the states ultimately were responsive to the people. They chose how to choose their electors. Everyone chose popular will for good reason. And I would just say- at day's end, it's the government's accountability to the people. And here's, I guess, the point too, even if regional minds can differ on the history, the Supreme Court, I think, has definitively said how to understand it, is that the way in which the framers understood the presidency and the reason that it gave the president and the president alone the entire executive power, this is the entire point that Judge Walker was racking up, but was mentioning in his opinion, is that we're a divided power elsewhere. It gave the presidency unitary power, the entire executive power, because the president alone was the only person in the country, along with the vice president, who was answerable to the people who stood for a single election. So I think the line between the president and the people, at least under the Supreme Court's existing jurisprudence, needs to be clear. There must be a clear chain of command, and at-will removal facilitates that. When the lines of accountability get blurred, the system starts to fall apart. And I just want to understand how the system starts to fall apart. Because you tell me lines get blurred. That's very abstract. And we're talking about real agencies that affect real people here. So I want to understand how it is that this is harmful, because it seems to me we have a lot of amicus briefs, particularly about the Fed and other agencies, that it would be quite harmful to make these independent agencies subject to presidential control. There's going to be a lot of effects on real people and real adjudication. It's harmful because it disables the will of the people. When the people elect a president, they elect him to wield the executive power consistent with that mandate. So I'll give a good example. It's one of the agencies before you. But the people, the voters know that they're independent agencies. So they're not voting on who's president based on what the Fed is doing. I think that conflicts directly with the logic of free enterprise and serial law, is that when the executive branch does important work, that's the words from Collins, when the executive branch does important work, the president answers to the people for that work. It is not as if the electorate parses between independents or non-independents or quasi independents, something like that. The Supreme Court has made clear that when an agency wields executive power, that has to be, under our constitutional system, attributable to the president. And the only way in which that works is if the president can hold the agency heads to account, because they are the ones wielding his power. A great example is one of the agencies before you. The Supreme Court has described again and again, the NLRB, as the agency that has the primary responsibility for setting and developing national labor policy for the country. That is a huge deal, something that voters care about, constituency cares about, and what the labor policy is for the executive branch is something that the president and the president must be accountable for. Can I ask about the breadth of your theory? You said just purely adjudicatory authority is sufficient to constitute executive power for these purposes. So, we have to, I totally understand how you get from modern precedents, right? The vesting clauses create three buckets, and this can't go in bucket number one or bucket number three, so it has to go in bucket number two, and QED when we're done, right? That's your position, but how do we reconcile that with Humphreys? I mean, you said Supreme Court precedent, we have to deal with two, not just SILA, but also Humphreys, and if simple executive adjudication were, administrative adjudication were executive power in this sense, neither the 1935 FTC nor the War Claims Commission in Wiener would survive that test. Right. So, I think that the way in which... What's left of Humphreys. Yeah, I think the way to sort of square what might be a tension between different lines... Yeah, a little bit. Sure. It's exactly what Judge Walker said, that the yardstick is the 1935 FTC. I think that's the way in which it works. The way in which Collins and SILA law square with the earlier precedent is that the field of doubt contemplated at the end of Humphreys is gone. Once you clear the threshold of the 1935 FTC, once the executive power, whatever it may be, is greater than that, the agency heads must be removable at will. That respects the core of Humphreys for at purposes. But once you go beyond that, it's a degree of executive power that triggers the need for immediate accountability. But the 1935 FTC and the War Claims Commission both could do administrative adjudication. Absolutely. So, that doesn't distinguish on the criterion you just laid out. Yeah. I think there's also an element of a difference of degree. So, it, I think, is a tremendous mistake to read Humphreys and Wiener as blessing all adjudication for all time. You look to the range of policy outcomes and policymaking ability that the adjudication is able to effectuate. Something to add to the equation. That's a great answer for Wiener. I'm not sure it's an answer for Humphreys. Unfair methods of competition is akin to unfair labor practices. Right. I think- Wide open statutory criterion that invites policymaking. Right. I think that's the exact argument Justice Kagan made in footnote 10 in her dissent, which was that, hey, the FTC did a ton of stuff. It doesn't really seem to be in Humphreys itself. What do we make of that? Can't we read Humphreys really broadly? And that's the entire import of footnote four of Celia Law, which is that, that opinion reaches no further than the powers considered at the time. The powers that gave rise to the constitutional reasoning in that part of the opinion. And there, it was that the agency was legislative and judicial aid. That was the key focus. And the specific part of Humphreys, you're right, says section six, I think, make reports to Congress, quasi-legislative, section seven maybe, be an adjunct to the court, recommending remedies in antitrust cases. That's quasi-judicial. That's easy, but they do have a reference in the opinion to filling out the details of the controlling standard, which is this open-ended, unfair method of competition thing. So you could read Humphreys as having considered the power to do administrative adjudication. So I think that even if you do- For purposes of footnote four or whatever, right? So even if you do, I think that's not necessarily the best reading of Humphreys, but putting that to the side. It's close, but it's sort of in there. I agree. So even putting that all to the side, again, I don't think Humphreys blesses all adjudication for all time. It still depends on the type of power that the agency wields. And this is, I think, a key point from Celia Law, is you look at also not just the ability of an agency to interpret and implement a federal statute, which is the essence of executive powers, how much can they do with that? And a key piece of that turns on remedies as well. So again, the FTC, even that piece from Humphreys, had a mild negative power to issue a cease and desist order in that alone. What the court emphasized in Celia Law is when you have the ability to enforce policy making, the ability to interpret and implement a statute through far-reaching remedies, that starts to become substantial executive power that is different in kind. So a good example is both the agencies before you have the ability to obtain monetary relief. And Celia Law said already that pulls you outside the mold of Humphreys. Being able to participate in the rulemaking process, that pulls you outside the mold of Humphreys, administering an entire federal scheme, like the NLRB does with union elections. That's a little more, I mean, that's a lot more fine-grained than just saying they can do adjudication and therefore we're done. Well, I think that that can't be right, because on that logic, you can turn virtually any cabinet agency into a multi-member commission that does adjudication, AG, HHS, HUD, EPA, what have you, and say, well, nevermind, Article 2 has no problem. And I think- Start at the other end of the spectrum. Your position is the president is constitutionally entitled to remove at will members of the Court of Appeals for the Armed Forces. So I think that, again- Nobody thinks they have an iota of policy making, right? They don't invent 12-part tests. They do exactly what we do. They construe text. They find facts. Right. So I think, again, all that's before you is two different agencies. And again, I think there's the preface, as someone might hear, is that the point from free enterprise is a sound one, is you take the agencies before you. Our test, just to bring one point, it's not our test. What we're repeating is verbatim what the Chief Justice said in Celia Law. And what the lower- We have to harmonize both cases. I understand. But the way in which I think it addresses the concern you're reaching with Article 1 courts, Article 4 courts, things like that, is Celia Law's most natural test is for traditional executive agencies. And to the extent it doesn't map on necessarily one-to-one with something like some- What's your answer on the CAEF? So I think it's a different agency that presents its own history, presents its own court's decision- So what's your position on that, though? I think that's really important, because I think Judge Katsas is raising a really important question about adjudicative function. And it's really important to understand what your position is about these courts that are housed within the executive branch. So our general legal position, the principle to apply in cases, is that the fact that the trappings of the agency look judicial- The question is, can they be subject to- Yes, I don't have a concrete position on agencies that are not before you, but the way in which to think about the question- How can you not have a position on that when your position from my first question was, you think that virtually any agency within the executive branch has to be subject to- But those are, I think, that's the default, and those are the principles to start with. And the way in which to think about- But isn't the assumption, then, that these courts that are housed within the executive branch, they have to be subject to- So here's the key distinction. As I was saying before, is that Celia Law, as it frames its test, and as Judge Walker was emphasizing this point, is most naturally applicable applies one-to-one with executive agencies, those that definitely wield core executive power. All I'm saying is that there's distinct analytical questions presented that come with things like Article I courts- We're agreeing with you, and we're asking, what is the government's position on how this would apply to the courts that are housed within the executive branch? So again, we don't have a definitive position on agencies not before you, on agencies not before you that are outside, that are not traditional regulatory agencies. So the reason you don't have a position, then, is you concede that they might be allowed to have forecast removal protections because they're adjudicative? It's not a concession one way or another. The basic point is that you think about it in terms of, is this agency, first of all, exercising executive power? But the reason you're not willing to take a stand on this seems to be you're entertaining the possibility that they are allowed to have forecast removal, even though they're within the executive branch. So what I'm saying is that the executive branch, or the federal government as a whole, is large and sprawling. Many different agencies, their own different histories, their own different idiosyncrasies. Yes, but you're taking a position that is sweeping. You're taking a position that says any agency that is housed within the executive branch is exercising substantial executive power and has to be subject to- A traditional regulatory agency. And what I would point to, I know a lot of angst has built on this, something that I would direct you to is a court's decision in Arthrex. When a traditional regulatory agency, even if it takes the form of adjudication, rulemaking, what have you, is wielding core executive power. And the analytical question for you as a lower court is, is that executive power substantial? The only point that I'm making is that you don't need to bite off anything more than that because just distinct questions come with Article I courts after Freytag, for instance. Those are not treated as executive agencies. I'm sorry. I think we need to bite off more than that because we have to understand the implications of what you're arguing. And it's very important to understand how the adjudicatory function plays into this. And the courts, as Judge Katz has said, are the clearest example of that. And you're not willing to take a position on that? Sure. I think the point would have more force before CELIA law. So for instance, if the government was coming before you and say, hey, let's say that the law should be this. The test should be this. I think then it's a fair pushback to say, well, before we adopt that test, where might it lead? Our point is much more modest. CELIA law has already told you what the test is for agencies like the ones before you. So you should take CELIA law at its word and apply the test that the court already handed down. And I'm not saying, I don't know where this road leads. So you don't have a position on the CAF? Correct. I assume by the same logic, you don't have a position on the tax court? No, we have no formal position on the tax court either. Okay. What about purely adjudicatory agencies in a split model within the executive branch, like FMSHRC and OSHRC and the benefits review? Right. So there's a separate entity that does the rulemaking and the prosecution and they're just an adjudicator. Yeah. So I think, I'm not as familiar with all the acronyms yet in our government, but I think that so long as you're a member of an executive agency, so long as you're engaged in adjudication, this is the square holding of Arthrex. You're exercising executive power. Now, again, when there's governmental entities that don't fit that mold. If that's true, then all the executive agencies are on the CELIA law's side of the line and the legislative courts are a big question mark. So the only thing you're willing to definitively put in the Humphrey's bucket is, I don't know, ACUS or some board that runs the Kennedy Center or something. I mean, is that really a plausible account of the part of CELIA law that says Humphrey's executor is still good law? Yes. It runs the Kennedy Center, it governs the Kennedy Center advisory. Yeah. No, no, no shots to the Kennedy. But yeah, I think, yeah, that is, again, for all the reasons that Judge Walker detailed, is that Humphrey's reaches no further. And again, not our test. This is what the Supreme Court said is that Humphrey's executor, as the court understood the FTC at the time, is the outermost bound that we are willing to tolerate. The outermost bound that we are willing to tolerate. And the way in which you figure out where that bound is set, what footnote four says is you look at the powers that were considered. So the yardstick remains the 1935 FTC, as understood by the court then, which is at bottom a legislative and judicial aid and nothing further. Suppose I think you might need more than just the power to do adjudication. I mean, one point you cite for the NLRB, which cuts in your favor, is rulemaking power. If you don't cite that for the MSPB, can you tell me what is your position on the extent to which the MSPB does or doesn't have rulemaking power? So it participates in the rulemaking process with veto. So it can veto OPM's rules and regulations under certain circumstances. So it has a role in rulemaking, a role in policy setting in a negative sense, which is different in kind from the 1935 FTC. But it can pass affirmative rules at least with respect to removal of ALJs. That's true. Federal Circuit has said those are legislative rules. Correct. And I think that's a good example. The key piece of this, and the ALJ example is a good one, which is in kind of contextualizing the power that the MSPB wields. In interpreting and implementing the statutes that the MSPB is charged with implementing, it is fundamentally providing content to the civil service laws for the executive branch, which is at bottom a policymaking function binding on the executive branch. What is good cause for an ALJ is a fundamental political judgment. Whether a disciplinary action is done for the efficiency of the service, which is the bread and butter of the MSPB, it's a fundamental policymaking judgment that it can then impose upon the executive branch. That is no doubt incredibly important work for which the agency then needs to be accountable to the president. Because again, the MSPB, one point I want to make is that the MSPB exercises the most fundamental of executive power. James Madison said, if anything is by its nature as executive, it's the power to appoint, oversee, and supervise those who execute the laws. The MSPB supervises the supervision of the executive branch that is at its core executive power for which the president must be able to hold the agency to account. Just if grant of rulemaking power, there are two specialized grants. One is in 7701, which just seems to be secondary conduct for the agency. One I mentioned on ALJs is 1305, clearly legislative, but kind of a very specific area. Do they have in 1204H, you don't cite it, but does that confer on the MSPB just power generally to make legislative rules about what constitutes a prohibited personnel practice? I think that's a key concept. Right. I don't have 1204H right in front of me, but I think that my understanding is the main way in which they provide content to those civil service laws is through the adjudicative process. I couldn't find many regs. Right. Substantive regs. I couldn't either. Other than the ALJ ones. Right. But I think that... It's not to say they don't have the power, but... I think, yeah. I can figure it out. Land in the same place. I think that it's mostly fleshed out via adjudication, but again, I think our basic submission that the constitutional analysis here, Article II, doesn't turn on the Chenery question that agencies have. And I think that whether it's rulemaking or adjudication, at days end, it's power. One thing... What about another way to get beyond just purely administrative adjudication is to look at litigating authority. And that's another one. I think I understand the NLRB a little better than the MSPB. So help me out with that. That MSPB, there's some set of cases in which they have litigating authority in district court and some set of cases in which they are the named respondent with litigating authority in the federal circuit. Right. I think there... Can you help me? District court is someone in both... Like an employee invokes Axon to do an end run around channeling and challenges something about the board. Yeah, a good example. I think the case we're talking about. Yeah. Independent litigating authority also in the court of appeals, just not the Supreme Court. And a good example is a recent court case out of the Ninth Circuit, which relates to exhaustion, what has to go before the MSPB. It was a good example because in one, you had the Department of Justice taking one position, the MSPB taking another as to what the executive branch's view of federal law is. I think that the reason Buckley recognized that independent litigating authority, the ability to vindicate public rights in federal court needs to be understood as executive. I think it illustrates the accountability point in stark measure. Here before a single court, you have the executive talking outside both sides of its mouth. And that just cannot work, I think, within our system. And that is why independent litigating authority is so important. In the bread and butter MSPB case, right? Which is, they're sitting in an appellate capacity, they uphold an adverse personnel decision and the aggrieved employee goes to the federal circuit. That's most of what they do. In that situation, the aggrieved employee is the petitioner and the employing agency is the respondent. And the MSPB is like a district court judge here. We don't have the district court at the podium defending their decision. They're just the neutral adjudicator. Yeah. My understanding is they can participate. So for instance, the Ninth Circuit case I mentioned, they participated as an amicus, took argument time and presented their view of the law. And again, the statutory term is phrased very broadly. So you can participate in any civil action so long as it implicates something like that, the functions of the MSPB. And that term has been used broadly for the MSPB to be able to articulate its view of federal law in federal court. If I may, for a moment, turn to Remedy. I'd like to hear your- Any other questions on the matter? Yeah. Can you talk about the Federal Reserve? What is your position about whether your interpretation would allow the president to remove the chairman and the governor to the Federal Reserve? So again, the Federal Reserve, I think, presents a distinct constitutional question, not before this court. Well, I'm sorry. You keep saying things are not before this court, but you're advocating a position that's going to have implications. And that's really going to be an important part of how we decide this case. And so you coming here and not being willing to take positions on other agencies is not helpful to the court. I think the premise is wrong. We need to understand how this is going to work. I think the premise, we quibble with the premise. I think the whole point, as I understand the force of the question, is the test in Celia law will necessarily apply in full force to other agencies. The point that we're making is- My question to you is, what is the government's position on how your interpretation should guide how we apply this test that you're proposing to the Federal Reserve? Because the Federal Reserve does promulgate regulations. It has examinations. It brings enforcement actions. It regulates a very large part of our economy, the banking system. Right. So it's important for us to understand what you're asking for. So what we're asking for, again, all we're asking for is for you to apply the test in Celia law to the traditional regulatory agencies before you. How does it apply to the Fed? A distinct question. We have not taken a position on how to exactly apply that to the Fed. It's a distinct agency that presents its own questions. Why might it be different? So it might be different for all the reasons that the Chief Justice, Justice Alito, and Justice Kavanaugh said it was different. It's because the Fed has a unique history. What I mean by unique history, that it's the one independent agency that I think has a colorable claim to historical analog that dates to the founding. And I think the Chamber of Commerce brief does a good job with this, where it traces the idea that monetary policy might not be considered an executive, a traditional exercise of executive power in the same way as the executive power that is clearly for this court now. So all I have to do, I think, for present purposes, again, as a lower court faithfully applying Celia law, is you take the agencies before you under the test that the Supreme Court told you to apply. And again, taking the note from both the Chief Justice, Justice Alito, and Justice Kavanaugh, that the Fed's historical status presents a distinct constitutional question not presented here. So our position is nothing here dictates what happens to the Fed full stop. That just seems like the Fed clearly satisfy the rule statement from CELA that you want us to apply, unless we're just making up ad hoc, historically based exceptions. And I think that what happens with the Fed and the questions that come with the Fed are distinct questions for another day, because of its unique historical status. I take the point, but again, it has a unique claim to history. It may have an exception. And Justice Alito phrased it sanctioned by history, and no other agency can necessarily claim. And again, the point here is not... is for us to be able to probe your position and to better understand the implications of what you're arguing and what you're asking us to rule. And for you to come in here and not be willing to take a position on how your position would affect Article I courts that are housed in the executive branch and the Federal Reserve. These are really important questions. And I just don't see how it's helpful for you to come in here and say, you don't have a position on that. Can I take a crack at just where I think the departure might be? Yes, please. So the test from Celia law is, is the agency before you wield substantial executive power? The wrinkles in here is both with the Fed and with Article I courts, and for that matter, Article IV courts, is that the Supreme Court has said, or at least implied, that those agencies might not exercise traditional executive power. So think of Celia law as a two-step inquiry. Is the agency before you? The reason why the courts are important is because if you're saying that they don't exercise executive power, then maybe the MSPB and the NLRB don't either. They're also a two-step inquiry. So I think you're not letting us make that analysis if you don't give us your position on the court. So the difference is that everyone agrees, and this is footnote seven from even Justice Kagan's dissent, that when a traditional regulatory agency within the executive branch exercises governmental power, it must be executive. It is different in kind than a... So, again, maybe in terms of the Appointments Clause, those are all clearly the language of the department. So you agree that the Fed exercises traditional executive power? The difference with the Fed... Does it exercise the power? Even if there are other reasons to distinguish it, it exercises traditional executive power? With respect to monetary policy, the core function of the Fed, we have not taken a position because it's a hard historical question. For all of the reasons, again, that those justices recognized, Judge Oldham did too. It does exercise. Again, so I'm saying we did not take a position with it. The point, there's two pieces here. But how can you not take a position on it when the Fed promulgates regulations and investigates and brings enforcement actions? You don't think that's executive? Those actual functions are not executive? There's a few pieces, I think, to the analysis. The first is, as I understand also... Can you just give me a yes or no answer on, is promulgating regulations executive? The problem... When a traditional regulatory agency promulgates regulations, that is an exercise of executive power. Okay. And bring enforcement actions, that's executive? Again, when it's done by an executive agency, that is executive power. Great. And the Fed is an executive agency. But again, the key piece of the analysis, and this is even in Humphreys too, if you look at the key footnote in Humphreys, is the nature of the agency is usually defined in terms of its predominant power. And when monetary policy, for instance, is the defining trait of the Fed, that again presents a distinct question. When the main bread and butter thing of which it does, monetary policy is not necessarily an application of executive power. Again, we're not taking a position, but it's a distinct step one question. I understand. I guess the difficulty is, if you tell me that there might be an exception for the Fed, and there might be an exception for Article I courts, then I don't know whether there should be an exception here either. Here's the key fork in the road, I think. The common thread between the Article I courts, the Fed, the Article IV courts, is that as either historical or doctrinal matter, there's a significant step one question as to whether that governmental entity is wielding traditional executive power. That is not present here. Here, you have a traditional regulatory agency. I understand your question about here. I really want to get to other contexts that are implicated, but it seems that you're not able to do that. No, we have not resolved that step one inquiry for agencies not before this court. I'd like to go back to separation of powers for a moment, because I understand your conception of it, which favors this very strong executive. I guess separation of powers also requires that the executive not encroach on the prerogatives of Congress. Congress is tasked with checking the executive. What you're asking this court to do essentially is to take more than 30 independent agencies that Congress created as independent and move them over to be directly under the control of the president. How should we think about separation of powers in that respect? Because separation of powers is also, it's a two-way street. The executive can't encroach on Congress. It's supposed to prevent autocracy. The question is, why are these more than 30 agencies, which were designed by Congress to be independent, why do we need to move them under control of the executive? How should we think about separation of powers in that light? You should think about separation of powers the exact way the Celia law majority thought about separation of powers. What they pointed out necessarily, and Judge Walker, I think, made this point really well, is that in all of these cases, there are policy arguments on behalf of independence applied one way or another. The Constitution in 1789 made that policy decision for the country, which is that when a substantial executive power is wielded, it must be answerable to the president. I understand the rationales for independence. Justice Kagan did a great job detailing them, but it was in a dissent. If the end goal is enhancement of liberty and all of that, I just don't see how liberty is enhanced if Congress has designed it one way. You're saying that the Constitution requires us to not allow them to do that. Nor did Justice Kagan. She made this point very powerfully in dissent. I think that the view of the separation of powers that won the day, and that is ultimately binding on this court. You think it doesn't matter? Do you think a president can come into power and fire every judge on every Article I court and replace them with his own pick? The point that we're making is that Congress, obviously, has a tremendous role to play in the separation of powers. Do you think that that shouldn't matter to the analysis? A president should be able to do that, so that lines aren't blurred? I don't think the normative question of the role of independence as good government, as a general matter, plays much in the analysis. Again, there are rationales for independence in every one of these cases. Do you think a president could do that? Because these courts are exercising executive power, he gets to remove them for any reason, and he could fire every judge in an Article I court and replace them with his own pick. I think, if I understand the question, if an agency or if an agency head falls within the president's conclusive and preclusive, exclusive authority to remove, that's the nature of exclusive authority. I mean, if it falls within his constitutional removal power, he can do it for any reason. If a president is running for re-election, he would like the Fed to lower interest rates to boost the economy, and he pressures the Fed to do so, and the Fed says no, he could fire the Fed and all the governors. If that enhances liberty? I mean, obviously, as we've discussed now at length, we don't have a view of the Fed, so I don't have a concrete... If they are an executive agency exercising executive power, that would be permissible, and that should factor. A good example, which we'll agree, is Secretary of Defense, head of the EPA, head of a host of agencies that wield tremendous power, yes, the president can remove that person at will. The best line, I think, from Justice Scalia's dissent in Morrison is that a system of separate and coordinate powers by necessity involves an exclusive power that theoretically may be abused. At day's end, the Constitution assigns exclusive powers to the branches of government, and you're correct. There are ways in which you can hypothesize a whole host of those exclusive powers being used for good, for bad, for something in between, but that is never a license for a separate branch of government to exceed their bounds and entrench upon the exclusive power of the president. When it comes to principal officers that wield substantial executive power, I think the Supreme Court has been elusive. They need to answer to the president. I'm sorry. Okay. I'm sorry. I appreciate your indulgence. I just have one more question on that here. I guess I have an overarching question, which is why can't Congress design independent agencies? I mean, it seems to me that it begs the question to say, because they can't, because they have to act, because it seems to me that independent agencies, they're not accountable by at-will removal, but they're accountable in other ways. They are appointed by the executive. They have staggered terms, so every executive gets to appoint some of them. The executive gets to appoint the chairman. The executive gets to be involved in the budgetary process to fund the agency. They are also accountable to Congress. There's impeachment. There's statutory amendments. The president has to sign these into law. I'm just wondering, why is at-will removal the only way to hold an independent agency accountable? Why can't there be... Why doesn't it have to be a black or white thing? I think that the most straightforward way to say it is because Colin said so. Colin says that there is no substitute for at-will removal because at-will removal has been understood from 1789 onward. Assuming the whole executive power. Exactly. I think our answer to it, and possibly partway is on it, but our answer in the most straightforward way is why, to answer why, is that the entire executive power is vested in a president, in the president alone. When his agents wield this delegated power, they must be answerable to him. Whether or not both things... Can it be answerable in a different way? Certainly, the dissenters in free enterprise and serial law took a really good crack at that, but for the purposes of this court, I think the answer is no. Serial law answers that question already. I'm going to take just a few minutes on remedies. Do you have any questions on removal? No, let's do remedies. Okay. We'll give you a couple of minutes on remedies. The basic points of remedy is that, as the Supreme Court, I think, has made equally clear in cases like White and onward, is that the federal courts cannot use the injunctive power to order the reinstatement of a federal officer. The main argument I understand on the other side is that there is a history of legal remedies reinstating people to certain people to certain offices. Of course, that history has no answer to the injunctions that are actually pending before this court, but I also... It's a pretty robust history. Of legal remedies. What I mean is you have an injunction before you, which is an equitable remedy. Yeah, but in the post-merger world, if you have cases going back to the beginning of time saying legal remedies are available, mandamus quo warranto, et cetera, injunctive remedies are not available precisely because legal remedies are, which is what White says. Why are we fussing over whether they use the M word as opposed to the I word? Yeah. I think that because Grupo Mexicano told you to sweat the small stuff and that the nature of the remedy matters. They have distinct demands and most fundamental... What is the demand of mandamus? Well, three... It's a distinct... It's not in the injunctive test and would not be satisfied here. And the clearest example is a different conception of the merits. So mandamus, unlike a permanent injunction, you need an indisputable entitlement to relief. It needs to be unambiguously clear. And our submission in this case is whatever you think of Judge Walker's opinion, we think it was 100% right. But I think it is impossible to say that it is so clearly wrong as to warrant mandamus relief. That's the key piece for at least part one of mandamus. Another piece of it too is you need a unambiguous duty at issue. And this, I think, was the key point that Judge Rao made, her opinion, was that when we're thinking about mandamus in this case, we need to first think about where is it going to lie? And you have mandamus, what would happen is for the first time in American history, running towards the president with respect to a principal officer. Put aside the president for a second. I mean, we'll come to that. But just on the clear duty point, Swan says that a duty to work with someone who is, you know, duty to keep someone not properly removable in office supports relief. You know, maybe it's mandamus, maybe it's an injunction, but the removed official, putting aside the president, can get relief. So I think when it comes to duty can be sufficiently clear once we figure out whether the tenure protection is constitutional. I don't think so. I mean, I think, I don't necessarily read Swan the same way. In that passage, I think it was a little bit unclear as to whether it's recapping the party's arguments or some presumption from the court. The best indication for that is in Severino, this court said that part is unclear. Whether the compliance with some removal statute can constitute a ministerial duty is quote unquote unclear under our precedent. That was in Severino. And I think that makes good sense for the reasons I think Judge Rao was getting at. You can't have this conception of ministerial duty be defined at a hundred thousand foot level to define the law or to follow the law, because then overnight everything's a ministerial duty. And I think here, the better way to think about it is the way that the Mississippi versus Johnson court thought about it is, is the action before you purely executive and political? And there are a few things more purely executive and political than the supervision of principal officers in the United States. And that's what Judge Stilberman said in Swan, criticizing majority. Criticizing majority. I understand. You didn't on that point. That's true. But I also think that the, again, the scope of Swan with respect to ministerial duties as the court clarified in Severino, I think is unclear. And Judge Rao, I think made this point well. The other point too, I think is you recognize in Dellinger is that what doesn't solve this is the president. And that's a big deal, constitutionally speaking. And the reason that it necessarily targets the president, even though if it nominally runs against subordinate officers, the key piece of this is that the appointment and removal of principal officers is an exclusive power of the president, is a power personal to him, such that when you disable its effects, in your words, necessarily target the president. I think that's a hundred percent right. And if you think of an analog to this, imagine for a moment, the president issues a pardon and lower courts say, well, we can't touch the pardon. Pardon is unreviewable, pardon is exclusive, but we'll just disable the world from giving it effect. I think everyone would see that as a direct attack on the pardon power outside of this federal court, outside of the federal court's authority. The exact same dynamic at play here. You cannot have a remedy, legal or equitable, run towards the president in the application to be purely executive and political duty. That is these injunctions. And that is what these would be mandamus remedy is to a T and as an independent ground set side decisions below. One difference is the Dellinger order that I found problematic at the stay stage didn't seem to carve out the president in the way that these orders do. These are very clear. They're not not targeting, not formally purporting to say anything by way of injunction or even declaration in the president. Right. I think that if I understand, you know, you'd be the authority on this. If I read your footnote in Dellinger, it was two points. One is, hey, it said all defendants and that includes the president open shot. But the other is even putting that aside, a legal remedy or equitable remedy, like the one here necessarily targets the president. Again, for all the points I was making before is because the fundamental action at issue is a personal and exclusive power of the president. And that pulls it into a different remedial bucket when it's a exclusive and personal power of the president. You cannot disable its effects without a remedy effectively running to him for all the reasons that judge outlined to. Would the remedy problem go away if they had sued for a warrant? So as I understand it, equitable warrant. Yeah, there's a lot of them. You need a usurper in office. And I think that unless you have that person there to object, the legal remedy isn't available, which is why I think we're talking about correct. But Florida, I mean, his brief was really big on cool, cool, warm tone. And I wondered, I understand. I don't necessarily view it the same exact way as the exclusive remedy in this case. So I asked about this last go around an oral argument. Matthew, again, because you represent DOJ, DOJ filed a brief in another case, and I think weakens your position here. When DOJ is filing positions and other briefs that are inconsistent with your position here. So the other case is AC Transport. And in that case, on one side of the V is the Secretary of Labor, the Mine Safety and Health Administration. On the other side of the V is the Federal Mine Safety and Health Review Commission, which is privately involved. But if you're right about a unitary executive, everything you've said for the past hour is correct. That case is like the Department of State suing the Department of Defense about an intra-executive dispute, coming to this court and saying, side with the Secretary of State. I don't understand how you can take the position you're taking in that case and take the position you're taking in this case. I think the basic way, the way in which I think about it a bit is that even in a unitary executive, the President can kind of let the kids fight. If you have two different agencies who want to take different views, bring it before this court, haggle it out, that may well be something within his power to do. Now, granted, the President can also settle dispute on his own. And as I understand it from that case, there's a Article III question about how does that dynamic affect this court's jurisdiction, which I can't speak at length to. But I think that's the sort of distinct analytical question there. I don't think there's any necessary problem Article II-wise. Again, the President's power is exclusive. It's definitive for him to choose not to exercise it at times, just as he can exercise it later. He could just choose not to make a decision and ask us for an advisory opinion about which cabinet department is correct. So I will pass on the tip to the team litigating that the Article III concern is at play. But I think that that is the distinct question there. I think that there's a analytical framework of what can the President do about managing his own branch versus how does that translate into a cognizable case in controversy for you to make the decision on? That's the distinct question there. Yeah, I'm going to guess, you know, Ethans and Rubio will disagree at times. It might be fun if he brought all those disputes to us and asked us to resolve them. But I don't think that's what Article III points you to. I take the point. But I think that for at least present purposes, it's an Article III point. Here, for at least the Article II argument about accountability, what kind of power can an agency wield is separate and apart. I think I'll ask all sides. How big of a hurry are you in for us to decide? I think with all deliberate speed, we would like to think. It might depend on whether you get the stay. Well, that's it. I mean, you ask for support. Yeah, then, you know, take your time. I don't have an administrative stay from the Supreme Court. So I don't know. You know, it's only an administrative stay as we're... I think in all events, proper expedition is appropriate because no one benefits from a lack of clarity in this area. And the seesawing that is involved in these cases is to no party. So I think everyone, I don't know, I won't speak for them. But expedition, I think, is to everyone's interest. I have one more question. We do have order from the en banc court in this case. And it does say that the executive conveners are presidential and they denied the stay. I'm just wondering, how should we think about that en banc order? It's recent in this case. It's the order of the en banc court. I think that you give it a really hard look and you give it a lot of weight, but it's not positive because a stay is a preliminary view of inheritance that the merits panel is still entrusted with giving its best shot at answering. And who knows? I mean, depending on the opinions in this case, depending on what's written, I know a lot of ink has been spilled on this already, but there's always more. You have a chance to change your colleagues' minds. You have a chance to give input to a possible Supreme Court case. The duty before this panel right now is to get the answer right to the best of your ability. Thank you. Mr. Zielinski. Good morning, Judge Cassis. May it please the court, Nathaniel Zielinski on behalf of Kathy Harris. Judge Cassis, I'd like to start by going over some of the functions of the Merit System Protection Board, which is where I think the rubber meets the road. And to do so, I want to start actually with where you were, Judge Pan. You noted that the government's position would lead to the sweeping ratification of a wide variety of independent agencies, potentially, including the Federal Reserve. And the reason, Judge Cassis, there would be such a widespread disruption is because the MSTB is actually the easy case under Humphrey's executor and Weiner, because it is engaged in adjudicatory behavior. So I'd like to start with those two points that you raised, one about rulemaking and one about litigating authority. So on rulemaking, my understanding is that all of the rules that MSTB makes are purely procedural. They're like court rules. So I see your briefs over there, Judge Pan. They've got red color. They've got green color. That's pursuant to rules of this court. Even the rules, my understanding for ALJs, and it's notable the government didn't brief this, Judge Cassis. My understanding is those rules as well that MSTB has promulgated are procedural in nature. I tried to run this to ground and couldn't quite figure it out. There's a grant of rulemaking authority in 7701, which seems pretty clearly limited to secondary conduct for the agency procedural. There's a separate grant of rulemaking authority in 1204H, which just says regulations as necessary to perform the MSPB's function. So you might read that as procedural only, but you could readily read that to give it the ability to pass legislative rules regarding the prohibited personnel practice, which is the rough equivalent of the unfair labor practice. So Judge Cassis, let me give you a couple answers to that. One is just empirically MSTB just hasn't done that. It just hasn't. It doesn't do rulemaking. The I don't want to talk about the review, potentially the negative adjudicatory power about OPM, but bracketing that off for a second, it does not do rulemaking. And so it's purely adjudicatory. To the extent you think that you could read- It might be like the NLRB, which has rulemaking power and doesn't like it. So I think that, I don't think just historically that that historical practice, I do think liquidates what the meaning of that rule is. But even if you thought that there's some possibility, I think the principles of constitutional avoidance say read H as to not provide that. If you think that's where the line is, and I don't think that's where the line is, by the way, I think we would win even without it. But if you think that's where the line is, principles of constitutional avoidance say, okay, read that power to be how MSPB has exercised it, which is just the promulgation of really, and I hate to say this, boring court rules, colors of briefs, how you file, just like the DC circuits, internal operating procedures and practices, just like the federal rules of health procedures. So I think you could just bracket that off as a matter of constitutional avoidance if it bothered you. And then in an appropriate case, you could always invalidate a rule MSPB passed as beyond the scope of its authority. And it's telling that the government didn't even raise this. And I do think if we're going to have a really serious separation of debate, we should look at substance, not shadow here. What about 1305 on ALJ? So my understanding is the same. I found a case, I think it's Tunick, don't hold me to that, but I found a case where the federal circuit treated regs under 1305 as substantive and having to go through notice and comment rulemaking, which would not be the case if they were just... Yeah. So the issue, because I haven't been briefed, Judge Katsas, I'm not as familiar with it. And if it would help the court, we're happy to provide supplemental briefing. My understanding is that the ALJ regs are codified at 5 CFR 12.01.139. My understanding is that that reg is procedural. Say it again. It's 5 CFR 12.01.139. And I will acknowledge this is very back of the envelope because this issue wasn't briefed. So to the extent that you would need further briefing, we're happy to provide it. I think by the way, we've been even without it. And I think one thing you could do is if you even had to go so far as to strike down that provision, it does not change MSPB at all. And RTHREX would give you that flexibility to choose remedy there because in RTHREX, there's a forecast removal provision. Power or strike. Yeah. And so RTHREX gives you that flexibility. And what I want to say is you could strike this power. And frankly, any of the other powers, the sort of ancillary powers that don't occur in practice, the government points to, an MSPB will not change at all. I also heard Judge Katsas, my friend on their side, to suggest when it came to the Federal Reserve, that you look at what the agency predominantly does. My friend on their side agrees that this agency is predominantly adjudicatory. So I think under that test, I mean, everyone agrees that what MSPB is doing is it's taking cases that have a set of facts and it's applying the law to the facts. It's things like partisan discrimination and whistleblower retaliation. And Judge Pan, to your point about Congress's role, Congress has the ability under Perkins to regulate the removal of ordinary civil servants that can say a president who's a Democrat can't fire somebody because they're vice versa. All MSPB is doing is taking the law and applying it to facts. And it's not supervising the executive branch. All right. So let's talk about the adjudication. I see two very different models of adjudication, right? One is just what courts do and what described as applying no policy other than the law. And that's a pretty fair description of the War Claims Commission in Wiener. I'll ask your friend about whether or not that's a good description of NLRB adjudications. But the MSPB, I mean, it looks, you look at the federal circuit opinions, the MSPB adjudications are more like January 2 Bell Aerospace kind of agencies, which get to make policy and change their views and invent 12-factor tests for assessing whether a sanction is excessive or not. It feels more like you know, national policy regarding civil service than it does no policy other than the law. So Judge Katsas, I actually think that we are squarely within the no policy other than the law. And I'm going to leave you a couple of responses and I want to walk through it. But the first is just sort of a top line. I point you to the brief by the former MSPB officials who are before this court who talk about how MSPB adjudicates cases. And even in, by the way, the Douglas factors, which I think is what you're referring to as a 12-factor test, that is extraordinarily deferential to the agency. And it's a test, and this court, by the way. Deferential, but it has the feeling of being made up of the agency doing something it could have done through rulemaking in adjudication, see January 2. So I don't think so, Judge Katsas, in the same way that this court will often have a multi-factor test to try and flesh out a legal standard. You know, we do that all the time, we look to these factors, however many may be, and you may not like 12. There's a bankruptcy test that comes to mind. You may not like any, right? But there's a famous bankruptcy test that involves determining substance over foreign bankruptcy. Comes from a Sixth Circuit case written by Judge Boggs. I think it has 11 factors. I don't think Judge Boggs wasn't engaged in a judicial function when he looked and said, this is the contours of that test. And one of the really promising indications, I think, of the fact that we are not engaged with it, the board is not engaged in any kind of policymaking is that the board doesn't flip-flop its tests at all or change its policies based on the composition of the board. And again, I point you to that brief by the members, former members of the board and former general counsel who actually say the board is remarkably consistent over time. And that's a humdrum adjudication where it's taking the standard. The case I found on ALJs was a flip-flop in which pre-Loeb or Bright, the Federal Circuit recognized a brand X power to flip-flop. It's extraordinarily rare. I'm not familiar with that particular case, Judge Cassis, but the members of the MSPB who are in front of you and are providing guidance for Mickey say that that is extraordinarily rare, rarely ever happens on partisan lines. So I think just empirically, that may be a needle in a haystack. It's not one that I'm familiar with. And it's certainly not one that the government has pointed to as concerning. But by the way, I think even if you took those powers, I still think we fall within the historical exception for multi-member boards or commissions because the test is not, is there any ounce of executive power? The test is one that's codified by historical practice. What Celia Law did, it didn't just say, is there anything more than what the FTC did in 1935? Because if that's the test, Celia Law didn't have to be nearly as long as it was. Celia Law instead contrasted on the one hand, single director agency structure of CFPB with a multi-member body. And the Merit System Protection Board is a traditional multi-member body. In historical practice, Judge Pan, it does matter. And it flushes out the contours in a separation of powers case of what the permissible boundaries of what Congress can do. And the fact that the MSPB looks like multi-member boards and commissions that have existed since at least 1887. And if you count Article I courts, which we do even earlier, in fact, Judge Pan, you probably could call this Merit System Protection Court, call it an Article I Court, and it'd be functionally the same thing. And I think that's a telling indication. Sorry. No, no, no. Go ahead. You want to talk in bold strokes. I want to take it back to nitty gritty of things that might or might not be executive. So help me out with litigating authority. So I want to be clear. My understanding is the MSPB has its own independent litigating authority when cases appear for one reason or another in district court. And then in the federal circuit, A, when the MSPB has acted in an original rather than an appellate capacity, or B, they've acted in an appellate capacity but dismissed a complaint for procedural and jurisdictional reasons as opposed to the merits of the termination. Is that about right? It's a little different. And I want to answer the question. First, I'm going to say that Justice Alito in the Perry case said that the Civil Service Reform Act was a bit like drafted by someone who picked wings off of flies. So it's very complicated is what I want to say. And so I'm going to apologize at the answer I'm about to give because it is, as Justice Alito said, a little bit like picking those wings off. The Perry case, I think, does a good job of explaining how cases can be channeled in different ways. In general, the MSPB will be litigating in two circumstances. The first circumstance, and it will always be in the courts of appeals, with one exception. Generally, they will be in the courts of appeals, and it can be the federal circuit. It can also be regional courts, including this court. And that will be when one of two things happens. When it's a complex procedural appeal, the boards will be in the name defendant, and the board's attorneys will go because this is a statute that literally is like picking wings off of flies. And so to assist the courts, that's the purpose of that provision, that the board attorneys go to the court. The second circumstance is in circumstance where OPM dislikes a ruling that MSPB has made and wants to appeal. And that's because MSPB, Judge Tanney, is like an Article I court. And so it's adjudicating cases that come before it. On the one hand, you've got the employer, an employee. On the other hand, you've got the employing agency. So where OPM says, I disagree with the results and I want to appeal to a court, MSPB will technically be a named defendant. Of course, the employee is also a party to that litigation. And so in that circumstance, the board will be a defendant. I do not think the board actually litigates cases in district court. The only circumstance in which it might, and my understanding is this has never happened, or at least in recent memory, there's actually a declaration by Kathy Harris in the district court to this effect, and an undisputed statement of material fact that the government did not contest, is the MSPB has the technical power to request that a court enforces subpoena. It would do that if it ever occurred in district court. Again, that's one of those powers that doesn't happen. And so if you under RFREX, if you were concerned about that, Judge Bassis, you could wave a hand tomorrow. It's gone. It's not going to change the agency at all. By the way, I don't think authority alone can be enough because almost every independent agency, or not every, but many independent agencies have litigating authority. And also litigation authority is not truly executive. It's executive. I mean, it's more executive than what the CAF does, what the tax court does, or what the Crime Safety Review Commission does, the Benefits Review Board. So Judge Katz says district court judges litigate in appellate courts. They are name respondents in mandamus cases. Very extraordinary. And it is- The mandamus statute was changed so that the district court judge was not named and put in that position. But it happened recently, in the In re Flynn is the last time I think, one of the times it happened in this court, sort of a cause celebre in terms of cases. So it's not purely executive. And purely executive, by the way, is not the test, but it's not even purely executive. And members of Congress can litigate in court as well. And how does the Congress litigate in court? But I think that just to step back for a second, I don't think that the question is, are you purely adjudicatory? I think we are very far on the adjudicatory side of the line. But I also don't think that the law was saying that the historical twin to the FTC and Wiener was the line. And so if I could, I'd like to convince you that there's more alive. If we just take the CELA test on its face and just apply modern vesting clause ideas, footnote four, I think, from city of Arlington, this was an easy case and you lose. So I didn't- The reason why it's a hard case is we also have to give some reasonable effect to Humphreys. That's why I'm trying to think of something to place agencies on this specter. And so I completely agree that CELA law looks to both Humphreys and I'd add Wiener in that list. Yeah. Right? And so, but I don't think CELA law is saying we are going to just look at, are you executive? Yes, no. Instead, what it's doing is it is looking at historical practice, because then Judge Kavanaugh noted in MPHH, deeply rooted history and tradition matters. And there's a deeply rooted history and tradition of multi-member boards or commission. If it were as simple as saying the vesting clause is the answer, does it exercise any ounce of executive power and it's not the FTC in 1935, then I actually think CELA law can be a much, much, much shorter opinion. That's not what the court said. It goes out of its way to say, to contrast those traditional multi-member boards or commissions with the CFPB, which is a single director agency. And I think it would actually be a bit of a bait and switch for the court to have said, we're preserving Humphreys executor and then to have narrowed it effectively into non-existence. But I do think that the Merit System Protection Board is about as purely adjudicatory. If that's where you think the line is, it's about as purely adjudicatory as an agency body can come. I'd like to talk for a moment about the OPM, the review of rules, because it's one of the other things that the government points to that you discussed, but on the other side. OPM, as Judge Henderson noted in her decision, that is actually a negatory power. It is just like when this court reviews a regulation. So it's an adjudicatory power. The government made some suggestion that we do this on a sua sponte basis. We could find a single instance of that ever occurring. I still think it would be adjudicatory by the way. So, and again, I come back to the Arthrex point, right? This just never occurs. It's like functionally, I mean, I think substance should matter in separation of powers cases, especially ones that threaten the Federal Reserve Board and foundational institutions that sort of undergird the government. And the fact that this never occurs, I think is extraordinarily telling. And you don't think, I guess, last point I have on adjudication, you can afford a much broader scope of relief than just a negative cease and desist order. You can adjudicate that and then you can defend it in court and you do the discipline. So we don't do discipline. I want to be very clear. The MSPB doesn't supervise the federal workforce any more than a court supervises college admissions, because it happens to apply laws against discrimination. The MSPB is in the business of applying laws against partisan discrimination, whistleblower retaliation, and the like within the federal government. And just like a court, when it looks at, as the Supreme Court did in SSA v Harvard, looks at college admissions and says it's violating Title VII, Title VI, so to- In 1215, do I have this wrong? A special counsel wants to discipline an employee or an agency for violating this or that prohibited personnel practice, you adjudicate that. So it's an adjudication. It's an adjudication, Judge Katz. It's just the same way that a court will adjudicate a question about what sentence someone should receive. I don't think anyone thinks that that is a prosecutorial function when someone comes before a district court. When the prosecutor comes before the district court and says, I would like this sentence to be imposed- Same point about ordering reinstatement and monetary relief. A hundred percent. It's an adjudicatory function. And the Ward Claims Commission did that, right? That is sort of running into SILA law saying the power to seek monetary remedies, as opposed to cease and desist. It's an executive-like thing, not consent. My understanding, I will say, this is not the vast penalties that were at issue in SILA law. We're talking, I think it caps out at a little over a thousand dollars. So just to be very clear about the penalties we're talking about. I think that that's why the best reading of SILA law, it really comes down to historical practice. So I maybe read SILA law a little differently than you do. So I do think the dividing line there is between single director agencies, traditional multi-member boards of commissions. And it's telling that the Supreme Court, Judge struck down a traditional multi-member board of commission. And because of the separation of powers case, I do think the practice of the other two branches matters as well. And no other president has taken this position with respect to the MSPB. In fact, OLC in 1978 took the position when MSPB was created, that it was a permissible kind of legislative body. So I think OLC's opinion deserves some weight here in the separation of powers context. And SILA law did look to the fact that there were a series of objections to single director agencies by the executive. Well, the exact opposite is true here. We're talking about Congress and the president, both cooperating to create an agency in reliance on the Supreme Court's precedent. Dan, any questions on Merit's? You said that MSPB is the easy case under Humphreys and Wieners. Do you mean easy compared to NLRB? No, I mean, easy compared to the gamut of potential agencies that are out there. So MSPB is taking law and it's applying that law to the facts of the cases in front of it. It doesn't do, for instance, rulemaking as Judge Katsas noted. The rulemaking that we engage in is purely procedural. And so I acknowledge that there's a spectrum of agencies. I do think that we may disagree on what the scope of that gray zone that Humphreys executive leaves in place is. So I probably think it's a little bigger than you do. I think though that we are on the far end. And I think Judge Henderson agreed with us at this stage. We're sort of at the far end of that bell curve. Do you think NLRB is at the same far end? I don't, I'm not here to speak about NLRB. I don't really, unlike the United States, I don't really have a position on separate agencies like that. How fast do you want us to go? You're facing administrative statements in court right now. I am not here to tell the panel what to do or not to do, but I think speed is helpful here. We did agree to expedited briefing for much the same reason. Give you a minute or two on remedies if you wanted. Sure, Judge Katsas, I really appreciate it. I would make just a couple of points on remedies. The first is I completely agree with you. The history here is extraordinary. And in this case, even if we don't have you on injunctive relief, and I think Swan and Sabrina are binding there on the panel, even if we don't have you on injunctive relief, the district court in our case was very clear that would have granted mandamus any alternative. And Swan split note one directly addresses the question of whether mandamus can issue. The court says that, quote, we find that the prerequisites for stating a cause of action under the mandamus statute are met in this case. So I just, I think that's binding. And even I take, by the way, Judge Silverman, not to have disagreed that a remedy could issue, he just didn't want to sign on to a bunch of what he called judicial chest thumping on the question of whether you could enjoin the president or not. Judge Silverman, too, agreed that relief could issue against the subordinate official. And, you know, I think it would be extraordinary indeed if you have Blackstone saying that there'd be full and effectual relief. Yeah. I mean, Blackstone, Marbury, they, they get you the typical case, not involving the president. To me, that's what makes this. Marbury involved a Senate confirmed official, your honor. All the secretary of state who was ordered to. But it's the same. But William Marbury. I mean, I gather there might be some history that Jefferson tried to remove him, but that's not to face of opinion. So, but William Marbury was a Senate confirmed official and the failure to, to, to provide the commission is tantamount to removal. So I think it's very hard to say that Marbury versus Madison is not a very early precedent for the proposition that this will run against principal officers. And I also think Judge Katsas that there, that the only way to understand the government's remedies arguments is to bootstrap the merits into the remedies. The government's remedies argument is we have this preclusive authority that no one can touch. And if, if you agree on that, you actually agree with the government on the merits, but if you disagree with the government on the merits, the remedies argument, I think, falls apart. Yeah, I get that. But what happens with the president be in violation of any of these orders if he nominated successors? So Judge Silberman addressed this in his Swan concurrence. And what he said is to the extent that the president could attempt to subvert the court's order, that's just another way of saying the president could court a constitutional crisis. And Judge Silberman had some delightfully colorful prose where he said, we either go to the barricades or the basement, depending on our predilection. And I haven't decided where I'm going yet, but the, I do think that ultimately... Is he bound by, is he bound by this order? Why is it, why would it be a constitutional crisis if he's... Because when the court has said, I think when the court has said what the law is, so let me give you an example in Youngstown. District court says what the law is in a case not involving the president and he's creating a constitutional crisis. So let me take Youngstown, your honor. In Youngstown, there was an injunction. It was, it was in the face of the opinion in Youngstown, it's very clear, right? That is president Truman's policy to seize the steel mills. And in Youngstown, the injunction issues against the subordinate official there, I think it's the secretary of commerce. If the president had picked somebody else who wasn't a named party of the injunction, had found some Marshall or some FBI agent, whoever it said, okay, now you seize the steel mills, right? You go and do it because you're not subject to the order, only the secretary of commerce is. I do think that is exactly what Judge Shultzman was talking about, right? We expect the executive in that circumstance to abide by the fiction that you sue the subordinate official. And that's how we get the judicial review against the executive branch. To give you another example, right? By the way, Nebraska on student loans. That is, that way of looking at it tends to reinforce your friend's view that in substance, though not in form, these orders run against the president. So I think Judge Katz says that we have historically, and again, I come down to Youngstown, right? In Youngstown, everyone agrees that you can get that relief, even though it is president Truman's policy, right? That you can get that relief against the subordinate official. Take Biden v. Nebraska. In Biden v. Nebraska, it is clearly president Biden's student loan forgiveness policy. And everyone agrees that you can get a subordinate relief against, sorry, you can get injunctive relief against the subordinate officials. And it would be extraordinary if we have this entire history and tradition dating back to Blackstone about the ability to get relief for officials, and then to say that is no more. And if I could just make one more small point, if you think that some amount of Humphrey's executor remains alive, so let's say you agree that Article I courts remain alive, and I do think we're like an Article I court, or you think the Fed remains independent and different because you don't think it's making ad hoc exceptions. I do think it is making ad hoc exceptions. Let's say you don't, Judge Katz says, and you think there's really a special tradition for the Fed. If you rule on remedy, you will make it impossible to enforce those laws. Because if there is no remedy, then the four cause removal statutes that Congress passed would be nothing. So if the Fed is protected, Judge Pat, and let's say there is a special exception for the Fed, all the president would have to do is fire Jerome Powell, and a court couldn't do anything other than cut a cashier's check and award him back pay, even though it's unlawful. That result can't be right. It proves too much. If there- So, sorry, just once more. Would the president be defying this order if he were to nominate a successor? I don't think he is technically defying this order any more so. Nor would the Senate be defying the order. No, that would then be a circumstance, to pick up Judge Walker's point, that would be the circumstance in which you would then seek a writ of pro lento if necessary. So now, I do think that, again, we're not there because we don't have a circumstance where there's a usurper, and so that's why pro lento is not appropriate. I agree with my friend on the other side on that. But Judge Katz, I think you could make the same arguments about Youngstown. Because in Youngstown, the president's point was, I have the inherent article to authority to seize the steel mills. So you could say, okay, well, he doesn't have to go to the Secretary of Commerce. He can go to somebody else and say, you seize the steel mills, and that person's not bound by the injunction, nor is the president. The president doesn't do that because part of basically executing the laws, part of that oath, is when the court has ruled not to try and court a crisis by saying, well, I'm not formally bound by the injunction. In that post-Youngstown, that president would be stopped in his tracks through the precedential effect of the Supreme Court decision. The Secretary of Interior or Defense, or whoever it is, would get enjoined in a second. That's not true. A district court injunction that doesn't run against the president doesn't. So I think the precedential effect here, right, if this court rules, that would then be precedential, right? You could immediately go, if, let's say, it's correntos remedy, you would immediately go to the district court, and the exact same thing would happen, right? You'd get the corrento against the potential usurper. So I think the same result attends there, Judge Katz. I agree with you that when it's at the district court, it's a little more complicated about enforcement. I know that some folks upstairs were having a conversation the other day about that, right? I mean, redressability in law has changed on whether you assume that the government has to obey a district court order that doesn't. So I actually think Franklin supports this, because even Justice Scalia noted that in the vast majority of cases, you're going to seek relief against the subordinate official. And so Justice Scalia did that. 13 comes out the other way, but never mind. Anything else? Thank you. Do you have anything else? No. I guess in the very brief moment that I had left, I just point out that I do think if this agency is unconstitutional, then, Judge Pan, we completely agree that that is not constitutional. I don't think Article I courts are going to be constitutional. I don't think any other independent agency in the federal government, the only one my friend can point to is the Administrative Constituency of the United States, would urge you not to radically disrupt the nature of American government and affirm. Thank you. Thank you. Good morning. Judge Katsos, and may it please the court. Chief. So before we get, which I'm sure we're going to, into the nitty gritty on the NLRB, I'll just say at the outset, I think that this appeal should be governed by precedent and by stare decisis, yes, but also by settled and unquestioned historical practice between the that takes on special significance in separation of powers cases. And for a century at least, our constitutional framework has recognized Congress's authority to create independent multi-member bodies whose members are protected from at-will removal, especially for adjudicatory bodies like the NLRB and especially the post-1947 NLRB. That understanding has been woven into the of our government structure and it is no small thing to change that structure. And I think members of this panel during the government's argument tried to probe the government's position about what the boundaries of its position was. And I think it was remarkable that the Department of Justice has come into court and does not have answers to questions that you obviously were going to ask about whether adopting the government's, I think it's safe to say, extreme position in this appeal will call into question institutional structures that have been unquestioned for a century or more, including the Federal Reserve Board, including the Article I courts that are also adjudicatory bodies like the NLRB. And I think that illustrates the wisdom of the Supreme Court's decision in free enterprise, in SELA law, and in Collins, not to revisit or to overturn Humphreys or Wiener despite repeated requests to do so. Let me take you into the nitty-gritty of powers that might be executive. So rulemaking. Right. Not mentioned in Humphreys and therefore under SELA, something we can consider. Well, so I do think as you said, Judge Katsas, earlier in a colloquy with my friend, Humphreys does mention that the 1935 FTC had this ability to fill in gaps and administer the- In the context of adjudication of- In the context of adjudication. Section 5 complaints. That's right. In the context of Section 6, which is where the rulemaking grant is, the only thing they talked about was these reports to Congress. It was that function that led them to say this is in relevant part quasi-legislative. They did not talk about the substantive grant of rulemaking. Yeah. I think it's unclear. It's a very short opinion. And I think you're right that it does not specifically call out that delegation of rulemaking authority. But I do think it's notable that the NLRB created in 1935, two months after Humphreys' executor, the organic statute was modeled on the statute that the Supreme Court had just sustained in Humphreys' executor. But I would also just emphasize that in 1947, in the National Labor Relations Act, Congress went in and restructured the NLRB. And it separated out the- That helps you on how you think of what would otherwise be combining of prosecution and adjudicatory functions. Right. Well, I think it also- In terms of the complaints. It doesn't stress this ruling. I think it helps us a little bit on this point, only in the sense that by 1947, it had become clear that the NLRB was exercising its functions as an adjudicatory body. Congress understood that there was no substantive rulemaking going on at the NLRB. And as Judge Millett said, in her opinion, the NLRB's rulemaking power is circumscribed. So the delegation is 29 U.S.C. 156. And it says that the agency can make such rules or regulations as may be necessary to carry out the provisions of the act. But the way that they can define by substantive rule, what counts as an unfair labor practice? Well, it is true that the agency can do that. As a matter of historical fact, what the agency has done is basically two things that have been sustained by the courts. One is to adopt rules of procedure or practice. We have to look at the powers, not what they've actually- Well, I think because this is a separation of powers case and because the historical practice matters, especially historical practice that Congress has acquiesced in, I think it does have a lot of substantive rulemaking and carrying out its powers in the way that the court has described as executive. But I also think it's important to understand that aside from rules of practice or procedure, which are the kinds of rules that a court issues, right? I'm not interested in the substantive rulemaking power. So the power to interpret the NLRRA, right? But especially after Loeb or Brown- Or pass legislative rules. Well, I don't- Loper complicates the interpretive authority question a little bit. Yeah. I mean, I think especially after Loper, Bright, it's clear and other decisions by not just the Supreme Court, by the lower courts that have clarified the NLRB's authority, that the NLRB has the authority basically to give the agency's view on statutory language. And I think what it has done in the very few instances in which it has actually promulgated rules that aren't rules of practice or procedure is essentially to distill the things that it does through adjudication. So the Supreme Court considered this in the American Hospital Association case. The rule that the agency put out there that was sustained by the Supreme Court essentially condensed and harmonized dozens of inconsistent decisions by the board about hospital bargaining units. And that rule by definition is, I think, would be considered interpretive, and especially after Loper, Bright, subject to de novo judicial review. But we get a lot of NLRB cases, and here's how the opinions run, at least until Loper. Here's every opinion. First thing we say, the board has the authority to set national labor policy, see Curtis Matheson, right? Second thing we say is we exercise, we give the board a high degree of deference, right? And sometimes we invoked Chevron, and sometimes we invoked State Farm. Yeah, I mean, to the extent that was true. Then Meninita was one. Five or six flip-flops back and forth. And every time that happens, we say, fine. We don't even talk about the statute. We just say they're implementing national labor policy. We give a quick review of their reasoning under State Farm, and we say, great. That's how it works. Now, you think post-Loper, Bright, when the agency issued the statute, that's how it's going to work. Well, I think Loper makes clear. The judiciary has the ability to say what the law is, and I think it would be not just, it would be the duty of an Article III court if it thinks that the NLRB has gotten the law wrong to say the law is X. Define the bounds of permissible discretion. And Loper says when you have a term like unfair, there are a range of things. Both three court in reviewing the work product of the NLRB, and these are adjudicators. They in panels of three. They function like appellate judges. They read the record. They hear oral argument. They reach reasoned decisions that are reviewable by Article III courts. It's not different from what courts do when they're reviewing the product of other specialized adjudicatory bodies, whether we call them courts or not, like the tax court, like the Armed Forces court, like the Veterans Affairs court. Robust rulemaking power than the NLRB. The NLRB is at the far end of the spectrum, right? And I think that the opinions in free enterprise and in sale of law, in particular in Collins, would be very different if what the court was saying is, you know, any time there's regulation, the power to issue regulations, even if it's as minimal and as infrequently exercised as here, that means you're on the wrong side of the line. Those opinions would be very different. Two more questions on specific powers. Litigating authority. So this is where I think- There's a weird scheme on how the board does or doesn't control the general counsel. So one hard point for you, pre-1947, would have been the prosecuting authority before the agency. And Congress took care of that. That board does that. That's right. Unreviewable. So that does not count against the board. Yeah. I mean, not only does it not count against the board, it makes this the easy case because Congress went in and took the executive or prosecutorial functions and placed them all under somebody who serves at the pleasure of the president. How does the bifurcated structure work when the agency has to go to court? Yeah. So the general counsel that does it- Correct. But your colleagues have cited this 1955 Federal Register memo, which seems to say that in court, the general counsel acts at the direction. Is that accurate? It's not. And I'm glad to have the opportunity to address this, Texas. So I think first, I would start with the statute. And that's 29 USC 153D. It makes it very clear that the general counsel shall have final authority over the-  Charges in the issuance of complaints and the prosecution of such complaints before the board. That's all before the board. So, right. Not what happens- And the Supreme Court has said those prosecutorial decisions are not reviewable. They're independent of the board. I'm spotting you. All the prosecuting before the board, I'm spotting you. So this is just the table setting. So the citation to this 1955 Federal Register notice, which is one page long and from 1955, it doesn't contradict the statute. The Federal Register notice says that the GC has full and final authority and responsibility over, quote, case handling, which includes the authority to accept and investigate charges filed, to issue complaints, to prosecute complaints, to enter into and approve the informal settlement of charges and to dismiss charges. And so no case can even come before the board unless the general counsel chooses to take those steps. Even if the president appoints a new general counsel, while a prosecution is already ongoing, the general counsel would have the full and final authority to settle or dismiss that case. And the government's brief doesn't claim otherwise. What the government is saying is that the GC acts as they put it in accordance with the of the board when the GC conducts litigation in federal courts. There's no question the GC has a kill switch. Kill switch. On the front end. On the front end, but also on the back end, because the general counsel is the one that supervises all of the attorneys. So if you think about the NLRB, Congress actually decided, they thought about making it into two agencies. They decided to call all of it the National Labor Relations Board. And I think that's part of the confusion because sometimes the board members and sometimes we're forced to the agency, but all of those attorneys, all of the people that go into court, everyone other than the people that are basically like the law clerks to the appellate judges, all of those people are under the direction of the general counsel who serves at the pleasure of the president. Suppose the board as prosecutor brings a case administratively and the NLRB finds no unfair labor practice and the board is angry and the aggrieved party, whether it's the union or the employer, files a PFR. Can the board lawfully refuse to defend that decision? It would be the general counsel. I'm sorry. Can the general counsel lawfully refuse to defend? Yeah. I mean, you can ask the government's position, but I think the government has taken the position that the general counsel has plenary authority. And actually the new general counsel that was named by President Trump, he regards his role as being that the head of an executive agency and having plenary authority. I read the 1955 Federal Register thing is inconsistent with that. Yeah. I don't read it that way. And I think the statute would trump, right? And so I would with the statute and the statute says, and the way that the Supreme Court has interpreted the statute is that what Congress was doing was affecting an internal separation of powers. And so the NLRB acting as a multi-member body is the appellate court and the general counsel is the executive officer, the prosecution, and makes the final and unreviewable decisions about what to prosecute and how to litigate and how to handle cases. And so I think that actually makes this a much easier case than it would have been if you had the NLRB between 1935 and 1947. I think we would still win under that because Congress was modeling the agency on the 1935 NLRB. Last question I have on powers is the board's control over elections. Right. Seems to be less in this split model of adjudication by one entity, prosecution on another. It seems like the board is vested with investigatory power. It's invested. It's told to generally supervise elections. It has rulemaking authority with regard to elections. That looks like investigation and adjudication and supervision and execution all bound up into one set of things. So my understanding of the way this works is that the regional directors are the ones who handle all of that election administration. And those regional directors report to the general counsel. This is made clear in the statute. Again, the only people that are not reporting to the general counsel are the people who are equivalent to the law clerks, to the appellate judges, the board members. And so I heard my friend refer to the election administration. I think that's just not right. That falls on the executive side of the line. So I wonder if one way we could resolve this case is just to follow the reasoning of Judge Ouellette in the Fifth Circuit case consumers research versus the Consumer Product Safety Commission, because it seems that that court was grappling with the same issues that we are grappling with. And as Judge Cassis put it, the reasoning goes one way, but they left Humphrey's executor in place. And what Judge Ouellette did was he concluded that the commission exercises substantial executive power. And that commission does seem to have more executive power than either the NLRB or the NSC. I agree. And then he said, nevertheless, because Humphrey's is still good law, according to the Supreme Court, he had three reasons why he upheld the forecast removal restrictions in that case. The first was that it does not require us to confront a historically unprecedented situation, which is true here, because CELA law really was unusual with a single head, et cetera. And the second, the commission does not share the defining feature, which was the single head versus the multi-head. And then third, the commission does not have any of the features that combine to make the CFPB structure even more problematic, which is the financing of the agency being not even through the normal appropriations process. Right. It seems to me that this is a roadmap for how we could resolve this case. Yes. I think that's right. And I think that's probably the narrowest possible way to do that. And I think I would just point out also that that approach was sustained by the en banc Fifth Circuit. So you have the Tenth Circuit, the Fifth Circuit, this court sitting en banc, and I don't think what they've all said is the same thing, which is a recognition that there's an effort to probe the outer boundaries of the existing precedent to overturn it, really. But the right thing for subordinate appellate courts to do is to adhere to that precedent and leave for the Supreme Court the prerogative to overrule the precedent. I like his observation that we're middle management circuit judges, and these big questions are really for the Supreme Court. So in the meantime, we just take this narrow approach. I think that is the best course here. And I think, look, they've already gone to the Supreme Court. The Supreme Court has administratively stayed the case. It didn't immediately grant the stay that the government asked for, nor did it set the case immediately for argument as the government asked. And so I think the prudent course here and the course that doesn't open up the Pandora's box that we heard about in the government's argument would be to do something like that and to leave for the Supreme Court the prerogative to overturn its own precedent. Thank you. There is no doubt that we are middle management, and there is no doubt that we cannot overturn a Supreme Court precedent. Do you agree that sometimes the court, without overruling its precedent, will limit its precedent? Oh, yes, of course. Okay. Do you think that we would decide a Bivens case the same today as we would before Egbert v. Boole? No. And actually, I just read Egbert yesterday, Judge Walker, because I thought you might ask about this. And I think it's actually a really good contrast, because in this situation, the Supreme Court has said we're not revisiting that precedent. In Bivens, the court has gone out of its way to criticize the precedent to say that we would never decide this that way, and it's hanging by a thread. Do you think there was criticism of Humphreys and Sela? No. I don't read the court as... I think when they say we're not revisiting the precedent, I think that means we're not revisiting the precedent. Egbert did not overrule Bivens. It did not formally overrule Bivens. And if we had a case that was on all four with Bivens today, we would have decided we would allow a cause of action. Right. Right? But we've been told not to expand it at all. Right. Right. Do you think we would decide a Kieran case, an Ex parte Kieran case, the same way today as we would have the year after Kieran was decided? No, and Judge Walker... And not Harrison v. Eisentrager before Bometti. No, and Judge Walker, I'm not asking you to decide this case the way you would in 1936. You and I talked about this in the state hearing. I mean, I think we actually, we agree on a lot. I think we agree that the task before this court is to decide based on all of the Supreme Court's precedents and that... How broad, how... I just decide how broadly to read Humphreys. Yeah, but I guess where we disagree is I think that the Supreme Court very consciously, in Free Enterprise and Ceylon Collins, meant what it said that wasn't revisiting the precedent. And it could have written the opinion very differently, but it contrasted this historically well-settled category against the novel features of the agencies with which it was presented. And I agree with what you just said about our area of agreement. I'm not sure everyone does, so I take your, I think something of a, I'm not going to call it a concession, but a statement that is consistent with some things I tried to say in an opinion that went against you last time. Overruling Humphreys is not on the table, and it's a complete straw man to say something like, uh, the Supreme Court has repeatedly told the courts of appeal to follow excellent Supreme Court precedent unless and until that court itself changes it or overturns it. We know it hasn't been overturned, and we know it has been changed, and the question is, how much has it been changed? Wait, wait, is that correct? I mean, I think, look, I don't want to retract my agreement with you. I wasn't quoting you, I was quoting... But I think that I'm just, I mean, I'm just saying what the en banc court said, which is that, you know, the en banc court emphasized that it's the prerogative of the Supreme Court to decide when to overturn the precedent. That's not debatable. We all agree on that. Right. I think that's right. The question is, has the Supreme Court changed Humphreys without overruling him? That is not what the Supreme Court said it was doing, and it was invited to do so, and there were dissenters, there were two dissenters who would have done so, and so I think, you know, the Supreme Court knows what it's doing. When it says we are not revisiting the precedent, it's not revisiting the precedent, and it has the opportunity to do so, and I think, you know, there are plenty of vehicles that are now being provided to the court. Your argument is we should read Humphreys as broadly as it would have been read the day after it was decided? No, no, I don't think so at all. I think, so I understand... We should read it more narrowly than the day after. No, I think I understand SALA law to have identified what it called certain organizational features that I think it thought were important to the decision in Humphreys, and it called out the fact that the agency had five members, that it was an agency that was supposed to do its job with impartiality, that it had duties that called for the trained judgment of a body of experts, that they had staggered terms, and... I appreciate it, and the brief is not surprisingly a terrifically written brief. I understand the points, and I get it. I mean, I think we probably agree on this, but then for a second ago, it sounded like maybe you were taking back the agreement. We can either read Humphreys more broadly than the day after it was decided. We could read it as broadly as the day after it was decided, or we could read it more narrowly than the day after it was decided. Which of those do you think is the option the Supreme Court has left? I think what the Supreme Court has said is we're not revisiting that precedent. I think that it was contrasting... I mean, the very first line of SALA law, right? It contrasts the CFPB. Does Congress in creating this agency... I'm going to ask the question one more time, I don't think you're answering it, and maybe I can't make it, but do you think we should read Humphreys as broadly as the day after it was decided? I would say, Judge Walker, that I don't think these two cases present that question, because even if you take your view from your opinion, which is that the only thing that's what you call the identical twin of the 1935 FTC, I think this agency, it doesn't even have the ability to investigate on its own, because Congress went in and effected this internal separation of powers. I think we should win even on that view. I disagree with you on that view, but I think we should win even on that view. I appreciate that. I was surprised a little to hear how you, speaking for the NLRB, think we should review NLRB decisions going forward. Oh, well, I don't... Are you pleasantly surprised? I don't know that I'm speaking for the NLRB, but I do think Loper Bright effects a sea change, and I do think it... I read it as telling, making clear that article are the ones who say what the law is. Ms. Wilcox is here in her official capacity. Is that right? No. Our complaint doesn't say, but I think you can read it that way. You represent Ms. Wilcox. I'm not speaking for the NLRB, but I'm not sure that it would make any difference if I were. It's de novo review. It's de novo review on the law. If I were to read you the standard of review section, it's only two paragraphs, from an NLRB brief filed on April 30th, 2024, and if I were to read you a two-paragraph standard of review section from an NLRB brief filed on April 30th, exactly a year later, in 2025, and I do have them... Yeah. Do you think you would tell the difference with Loper having happened in between? I don't know the answer to that question. You wouldn't want to play that game, right? I don't want to play the game, and I'm not sure that it has constitutional significance at the end of the day. I mean, there are... I mean, you and Judge Katz, you very thoughtfully answered Judge Katz's very thoughtful questions, and the way that you answered them was by saying, now that Loper has happened, our board lost a lot of power. We're not going to get the same deferential standard of review, and I'm telling you, the reason you don't want to play this game is because you would not be able to tell the difference between the NLRB standard of review section in April 2024, and its standard review section in April 2025. Yeah, and I don't think that the Supreme Court has, to be clear, has suggested in Saylor Law or in Collins or any of his cases that the standard of review that the Article III courts use in reviewing the work of adjudicatory bodies is the deciding factor one way or another. So, if I suggested otherwise, I don't want to clarify that. No, I mean, it might bear on how we think of adjudication. No policy, but the law or the vehicle for implementing national policy. Right, and I think the best way to understand what the NLRB is doing, and I think this was true before Loper Bright, but Loper Bright clarifies it, is that it is sitting just as you are right now as multi-member bodies of appellate decision makers receiving a record of the facts and applying the law to those facts subject to the review of Article III tribunals. With no substantial policymaking in between. Correct. This is not from either of the briefs I mentioned, but this is a post-Loper Bright NLRB brief. While overruling Chevron, however, Loper Bright reaffirmed that Congress may enact specific statutes granting discretionary authority to agencies tasked with prescribing rules to fill up the details of the statutory scheme. When reviewing the decisions of such agencies, courts satisfy their assigned role by ensuring the agency acted within the bounds of the delegated authority and engaged in reasoned decision making. Reasoned decision making, as you know, highly deferential standard of review. Congress entrusted the board with the discretion to formulate rules to fill the interstices of the broad statutory provisions. Again, highly deferential. It was settled long before Chevron, the development of national labor policy is a difficult and delicate responsibility that Congress committed primarily to the board. The board's exercise of its discretion must not be irrational and must not exceed its powers or venture into the area barred by the statute. The board's rules will be upheld as long as they are consistent with the statute. Loper Bright did not alter that standard review. Do you think that's consistent with what he told you? It doesn't sound like it. I mean, I think this is not, you know, I think that the government didn't brief the significance of the standard of review. I'd be happy to provide a supplemental letter on this point. But I think the main point is, I don't think that the Supreme Court has said that Article III review of adjudicatory bodies and the standard of review is constitutionally dispositive. And I think I would leave for the Supreme Court the answer to that question. Is there anything you want to say about remedies? I don't have much to add to what my colleague already said. I would just say that I think, you know, Judge Rao mentioned that Swan and Severino were not binding on the en banc court. I do think they are binding on this panel. And I think they like the way and I think if you make it easier, the job for this panel, which is, you know, there's already a holding, there's already analysis about the power, those are redressability holdings, but they're about the power of the federal court. And I think they're on all fours. Mr. Graber said to go fast. Mr. Zielinski said to go fast. Do you agree with him? I do. For all the same reasons. Thank you. Thank you, counsel. Mr. Graber. Just a handful of points. The first and maybe most fundamental is that I think at the essence of my friend's argument on the merits is asking this court to go down the road that Collins was clear you should not. Federal courts are no longer in the business of fine parsing statutes and powers to see how much of the president's important powers can he bear losing. The question, again, I agree. No, they said they're not going to revisit precedent, but the Supreme Court told you exactly how to read it. It says once you cross the line into substantial executive power at will removal, it's the constitutional rule. And the way in which- Could you address the sub-circuit opinion? Why is Judge Willett wrong? I think Judge Willett is wrong because the key, the opinion rose and fall essentially on the idea that structure and composition alone is enough. That so long as it's multi-member, so long as it goes through the trappings of adjudication, that it's sufficient. And our view is that it's necessary but not sufficient because Celia Law said it's necessary but not sufficient. I think what Judge Willett was saying is this is above my pay grade. If the Supreme Court wants to explain what it meant because there's some contradictory things in here, let's let them do it. In the meantime, here are the key things. They did explicitly leave Humphrey's in place, and here are the three key things. We're just going to leave it in place and let the Supreme Court deal with this. That seems like what middle managers should do, no? I think I agree with the middle manager analogy, but I think if your boss said, for instance, write a brief in the morning and do an argument in the afternoon, you would expect to do both things. So when your boss says it needs to be a multi-member commission and it can't exercise substantial executive power, I think you have to heed the second instruction too. And that's the key problem with the Fifth Circuit's decision. I think the- Can you just help me? Are you done on that? Can you help me on the relationship between the adjudicatory board and the general counsel vis-a-vis litigating authority and elections? Two points I was discussing with- I think it's modeled. The way in which I read the statutes is the same way I think Judge Walker did in footnote 162 of his opinion, where the statute is with respect to the non-ex ante, so the non-front end actions, the board calls the shots. I do think it illustrates- Including in PFRs in court. That's my understanding. And I think though it reveals just the fundamental problem, the kind of chaos this really leads. 1955 Federal Register notice is still effective. That's our understanding, which is why we used it in the brief. Oddly old and informal. Well, I think that- To settle something this basic. I think that if there's any theme of this case, it's going to turn on things that are oddly old and informal and what they may or may not mean. But I think it reveals a more fundamental point, which is that when you have things structured this way, when you have a board that is entrusted with developing national labor policy, building substantial power, and then you have a general counsel that might be accountable to the president, a board who is not an agency speaking out of both sides of its mouth, this is the exact blurring of the lines of accountability that the Supreme Court said should set off a three-alarm fire. And what about elections? With supervising elections, again- Supervising elections. I thought that was the board, but- That's my understanding too. Maybe I heard it as one of the generals. It's a board through the regional offices. That's again, it is not something that's exclusively assigned to general counsel. But again, I think the main point too, the response I hear again and again, and the one thing I want to throw on the table is, as I understand it from my friends, is their answer is don't sweat the power because it's adjudicatory in form. The answer to that though, and again, I don't think this gets as much attention, is Arthrex. In Arthrex, you're dealing with administrative patent judges who are as judicial-lite as it gets. They have a panel. There's witnesses. There's evidence. It's everything but the roads. They might have the roads. But the idea there, as the Chief Justice explained, is because everyone agrees it's an executive agency, and everyone agrees it's exercising executive power, even in the form of adjudication, the lines of accountability, all of those interests are implicated in full form. What matters, what matters across the board, and again, this is I think what the Fifth Circuit missed, is power. It's the ability of an agency to be consequential in the real world. That is the key litmus test. That is what sets the line. Judge Katz, as you're asking, what do we think about Humphreys? I think just one thing I would add with this is when you're looking even at a body that goes through the trappings and adjudicatory nature, then you could look to Wiener, which the Supreme Court was very clear was not an extension of Humphreys, but an application of it. You can ask, is the adjudicatory body for you different in kind than the War Claims Commission in Wiener? I don't think there's a serious argument that the MSPB and the War Claims Commission in Wiener. The very last thing I'll say is I'll end essentially where I started, and Judge Walker, you were picking up this point. No one is saying that the Supreme Court precedent is not binding. I think this case just turns on whether it's litigated in 1935 or 2025. Under existing precedent twice over, I think it is clear that the government prevails because the Constitution entrusts the entire executive power to the president, and agencies that wield his power in substantial form must answer to him. Thank you to all counsel for really outstanding arguments in this obviously important case. Case is submitted.
judges: Katsas; Walker; Pan